IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| S. GREGORY HAYS, Receiver for Mobile Billboards of America, Inc., et al., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | CIVIL ACTION FILE NO. |
| vs. | ) ) | 1:05 CV 2705-CAP |
| DAVID E. ADAM, et al., | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Plaintiff S. Gregory Hays, the Receiver for Mobile Billboards of America, Inc. and other related entities (collectively, the "Receiver Entities"), files this Memorandum of Law in Support of his Motion for Partial Summary Judgment as to Liability against all Defendants. In sum, the Receiver seeks a determination that all Defendants are liable to the Receiver Estate on the claims asserted for unjust enrichment and constructive trust.

**PROCEDURAL BACKGROUND AND OVERVIEW**

The Receiver was appointed by this Court on September 21, 2004, in a civil enforcement action filed by the Securities and Exchange Commission ("SEC") styled *Securities and Exchange Commission v. Mobile Billboards of America, Inc.*,

Civil Action File No. 1:04-CV-2763-WBH (the "Enforcement Action"). In sum, the SEC alleged that Mobile Billboards of America, Inc. ("MBA"), along with its principals and of the affiliated entities devised and promoted a fraudulent investment offering that, in fact, operated as a Ponzi scheme. As a result of an extensive investigation, the Receiver has determined that, in fact, the subject investment offering was a fraud and that MBA was a Ponzi scheme.

As more fully set forth below, the subject investments were actually sold through a network of independent sales agents, who were paid substantial sales commissions in connection with this fraudulent scheme. As a result, the Receiver demanded that sales agents return the commissions paid by MBA. This lawsuit was filed on October 18, 2005 against the sales agents who refused to address and/or resolve the Receiver's demand.

With respect to the Defendants' liability, the factual issues are identical and not subject to dispute. In sum, the subject investments were securities, but were not registered with the SEC or any state securities regulator. Moreover, the investment offering was rife with fraud. Accordingly, the sales commissions paid to the Defendants are impressed with a constructive trust and must be returned to the Receiver Estate for the benefit of defrauded investors. See, *In re Alpha*

*Telecom, Inc.*, 2004 U.S. Dist. LEXIS 20002 (D. Or. August 18, 2004).[1]

Accordingly, this Motion should be granted.

## FACTS

This case arises from a fraudulent securities offering in which MBA employed a network of sales agents to sell more than $55 million in mobile billboard investments to unsuspecting investors from 2001 through 2004. (Affidavit of S. Gregory Hays ¶¶ 4-5, 8, 13.) Investors purchased billboard "units" for $20,000 apiece, and simultaneously leased the billboards back to Outdoor Media Industries ("Outdoor Media") for a seven-year term. (Id. ¶ 5.) Outdoor Media was affiliated with MBA and owned and operated by MBA's principals. (Id. ¶ 6.)

Investors were assured that Outdoor Media would (1) arrange for placement of the billboard on a truck for advertising, and (2) make monthly lease payments to investors that provided a return of approximately 13.49% per year. (Id. ¶ 5.) As a part of the billboard purchase, MBA agreed to repurchase the billboard at the end of the seven-year lease term for the full purchase price. (Id. ¶¶ 5, 7.)

Investors were also promised that MBA had established a trust, the Reserve Guaranty Trust ("RGT"), to assure that money would be available to fund this repurchase obligation and that a portion of the purchase money paid by the

---

[1] Importantly, the Defendants' knowledge of the underlying fraud (i.e., scienter) is *not* an element of this claim.

investors was being deposited into RGT for this purpose. (Id. ¶¶ 7, 11(b).) In consideration for the portion of the payment made to RGT, the investors were issued a "Trust Secured Certificate" that entitled them to "an undivided beneficial interest in the assets of RGT with a liquidation amount of up to [$20,000 times the number of billboards] purchased." (Id. ¶ 7) While RGT was touted as being independent, it was also affiliated with MBA and controlled by MBA's officers. (Id. ¶¶ 7, 11.)

In truth, MBA's investment program operated as a Ponzi scheme, in that Outdoor Media's mobile billboard business did not generate sufficient revenues to make the monthly lease payments to the investors, but instead relied on new investors' purchase monies to make the promised payments to earlier investors. (Id. ¶¶ 4, 11.) Using monies paid by recent investors, MBA transferred money to Outdoor Media to fund the lease payments to investors. (Id. ¶ 11.) Moreover, monies had not been deposited into RGT nor had RGT been managed in accordance with the representations made to investors. (Id.)

The sales agents, including the Defendants in this matter, were members of organizations put together by "master sales agents." (Id. ¶¶ 8, 15.) MBA typically paid a 27% commission per billboard sale to one of the master sales agents, who in turn made a commission payment to the individual in his organization that actually sold the billboard. (Id. ¶ 8.) This extremely high commission amount was not

disclosed to the investors during the sales process. (Id. ¶ 11(g).) MBA also offered bonuses to their agents for reaching certain sales objectives. (Id. ¶ 15.) The agents received the sales commissions and bonuses for their participation in the fraudulent mobile billboard scheme. (Id.)

The investments in the MBA billboard scheme that were sold by the sales agents were securities, but were not registered with the SEC or any state. (Id. ¶ 17.) Defendants, as the sales agents and the primary contacts between MBA and the investors, consummated the illicit sales utilizing means of interstate transportation or communication, including United States mail, telephone and email. (Id. ¶ 16.) But for the Defendant sales agents' actions in soliciting investors, the MBA Ponzi scheme would not have occurred. (Id. ¶ 15.) In return for their efforts, the agents received more than $19 million in commission and bonus payments. (Id. ¶ 15.)

## ARGUMENT AND CITATION OF AUTHORITY

The Receiver's claim against the sales agent Defendants is very straightforward: Because the underlying investment was an unregistered security sold in violation of the federal securities laws, the sales agents are not entitled to retain bonuses and commissions paid to them in connection with their sales activities. What they knew or thought is wholly irrelevant. The monies paid by MBA to sales agents were, from the time of the sale, impressed with a constructive

trust and, therefore, must be returned. On the basic issues, there is well-reasoned judicial authority that provides clear guidance here. Hence, this Court should grant the Receiver's Motion and enter a judgment as to the issue of liability against all Defendants on the Receiver's claim for unjust enrichment/constructive trust.

I.   **The MBA Investments Sold by Defendants Were Securities Subject to Federal Securities Laws.**

The undisputed facts make clear that mobile billboard investments are securities. In the seminal case, *SEC v. W.J. Howey Co., et. al.*, 328 U.S. 293, 298-99 (1946), the United States Supreme Court defined an "investment contract" (i.e., a security subject to federal regulation) as: (1) an investment of money; (2) in a common enterprise; (3) with the expectation of profits to be derived from the efforts of others. Applied to the facts of this case, the *Howey* test of the "sale and leaseback" structure developed and sold by MBA and the Defendants clearly demonstrates that the investment is a security:

- Individuals invested money by purchasing what they believed to be mobile billboards.

- The billboard was sold by MBA and leased back to OMI. Both companies were under the common control and management of the principals – i.e., a "common enterprise."

- Investors expected to make a profit equal to 13.49% per year for seven years plus the return of their principal investment at the end of the term.

- Investors relied on others – i.e., OMI – to manage the billboard investment.

Though MBA made some effort to disguise this as a "business opportunity," these undisputed facts control the determination.

In a case arising from this district, the United States Supreme Court reviewed a virtually identical investment offering and, in a unanimous decision, held that the subject investment was a security. *SEC v. Edwards*, 540 U.S. 389, 394 (2004). The only difference between *Edwards* and this case is that the "sale and leaseback" investment involved pay telephones rather than billboards. Moreover, the payphone investment offering in *Edwards* also operated as a Ponzi scheme. Like the billboard investments in this case, the payphones were sold to investors and leased back in exchange for a monthly payment. Additionally, the payphone investors in Edwards, like the billboard investors in the case at bar, were told that at the end of the lease term the investor's payphone would be repurchased by the seller. Analyzing this fact pattern, the *Edwards* Court applied the *Howey* test and determined that the payphone investment was an "investment contract" (i.e., a security). Id. at 394 (citing SEC v. W.J. Howey Co., et. al., 328 U.S. 293, 298-99 (1946)); *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).

The *Edwards* decision is controlling here. The mobile billboard investment sold by MBA and the Defendants is a security.

## II. Defendants Sold the Unregistered Securities in Violation of Section 5 of the Securities Act.

Because the mobile billboard investment was a security sold to the public, it (along with the sales agents) should have been registered with the SEC and various states. 15 USCS §§ 77a et seq.; 15 USCS §§ 78a et seq.; O.C.G.A. §§ 10-5-1 et. seq. Under the Securities Act, it is a strict liability offense for any person to offer to sell, or to sell a security for which no registration statement is effective or has been filed with the SEC. Securities Act of 1933 § 5, 15 U.S.C. §§ 77e(a) and 77e(c); . SEC v. Calvo, 378 F.3d 1211, 1215 (11th Cir. 2004)("Scienter is not a consideration.").

A person sells an unregistered security when he is a "substantial factor" in the illicit sale. Calvo, 378 F.3d at 1215. "The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities . . . regardless of . . . any degree of fault, negligent or intentional, on the seller's part." Id. at 1219 (citing Swenson v. Engelstad, 626 F.2d 421, 424 (5th Cir. 1980)).[2] Defendants, as the sales agents and primary contacts between MBA and the investors, were substantial factors in consummating the illicit sales and utilized means of interstate

---

[2] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

1674158

8

transportation or communication in that end, including he use of the United States mail, telephone and email. (Hays Aff. ¶¶ 15-16.)

It is undisputed that MBA did not register the mobile billboard investment with the SEC (or any state securities regulator). (Hays Aff. ¶ 17.) Equally clear, the Defendant sales agents sold the mobile billboard securities despite the absence of a valid registration. Consequently, Defendants violated Sections 5(a) and 5(c) of the Securities Act when they sold the MBA investments that were not registered with the SEC. Thus, Defendants are strictly liable under Sections 5(a) and 5(c) of the Securities Act for the sale of unregistered securities.

### III. The Defendant Sales Agents Are Liable For the Return of Bonuses And Commissions Received In Connection With Their Sales Of Mobile Billboards.

Because all monies paid to the Defendants were derived from the illegal (and fraudulent) sale of securities, they do not have a legitimate claim to those funds. Under Georgia law, the recipient of ill-gotten funds does not acquire title to those funds, "but that such title remains in the victim, who is the beneficial owner of a constructive trust which is imposed on such monies." *First Nat'l Bank v. Hill*, 412 F. Supp. 422, 425 (N. D. Ga. 1976); O.C.G.A. § 53-12-93. Title to those funds remains that of the original owner, and the subsequent recipient, holds such property as the constructive trustee of the owner. Id. ("Where the constructive

1674158

9

trustee has invested such funds or has purchased other property, the real owner can follow it wherever it can be traced.").

In a case involving payphones that is factually identical to this case, a Federal District Court in Oregon confirmed just such a result. *In re Alpha Telcom, Inc.*, No. 01-1283, 2004 U.S. Dist. LEXIS 20002, at *22-23 (D. Or. Aug. 18, 2004) (a copy of which is attached to the Motion for Partial Summary Judgment as Exhibit A) (for background facts, see *SEC v. Alpha Telcom, Inc.*, 187 F. Supp. 2d 1250, 1254-55 (D. Or. 2002), aff'd, 350 F.3d 1084 (9th Cir. 2003)). As with the billboards here, investors in *Alpha Telecom* purchased payphones from independent sales agents and simultaneously entered into an agreement for Alpha Telecom to manage the phone. *SEC v. Alpha Telecom*, 187 F. Supp. 2d at 1255. Investors were promised monthly payments from the revenue generated by the phone, along with the opportunity to sell the phones back at the original purchase price after three years. Id. In reality, the payphones failed to generate revenues sufficient to make the monthly payments. Id. at 1257. Nevertheless, Alpha Telecom continued to pay existing investors and funded the payments by the sale of phones to new investors. Id. Like MBA, Alpha Telecom operated as a Ponzi scheme.

As in this case, the SEC sued Alpha Telecom and a receiver was appointed. The receiver, in turn, filed suit against the sales agents seeking to recover

commission payments received in connection with the payphone investments. *In re Alpha Telecom*, 2004 U.S. Dist. LEXIS 20002, at *11-12. The district court granted the receiver's motion for summary judgment under a theory of unjust enrichment. Id., at *20-22. The court found that the receiver was entitled to a disgorgement of the commission payments as a matter of law because the sales agent defendants sold unregistered securities (a strict liability offense), received commission payments as compensation for this illegal activity, and consequently, had no legitimate claim to those funds. Id., at *21-22. As the court in Alpha Telecom stated:

> The agents were paid for furnishing illegal services. The law cannot permit them to benefit from the sale of unregistered securities. Consequently, the agents must disgorge the amount by which they were unjustly enriched.
>
> Admittedly, this tends to make the agents guarantors of the products they sell. However, it also will make sales agents cautious, and they are in an ideal position to curb abuses. If an agent has doubts about the integrity of the product, or whether it is an unregistered security, the agent should not sell the product. Faced with the risk of disgorgement, due diligence might really be diligent, instead of an exercise in papering the file. This approach is not unprecedented in the law. For instance, modern product liability laws make retailers strictly liable, not just the manufacturer of the product.

Id., 2004 U.S. Dist. LEXIS 20002 at * 22.

For the very same reasons, the Defendant sales agents in this case are liable under the theory of unjust enrichment/constructive trust to disgorge the funds they received as a result of their illegal sale of the unregistered MBA securities. Hence,

partial summary judgment on the issue of liability should be granted against the Defendants and in favor of the Receiver.

This 27th day of November, 2006.

TROUTMAN SANDERS LLP

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308
Phone:       404.885.3000
Facsimile:   404.885.3900

By: */s/ Merle R. Arnold III*
J. DAVID DANTZLER, JR.
Georgia Bar No. 205125
*david.dantzler@troutmansanders.com*
MERLE R. ARNOLD, III
Georgia Bar No. 023503
*merle.arnold@troutmansanders.com*
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on November 27th, 2006, I electronically filed the foregoing Document with the Clerk of this Court using the CM/ECF system, which will automatically send email notification of such filing to all parties who are CM/ECF participants and served the defendants appearing pro-se by depositing a copy in the United States mail with adequate postage thereon and addressed as follows:

**Matt Bondurant**
1742 South Scales Street
Reidsville, NC 27320

**Jay Castro**
74-478 Highway 111, #242
Palm Desert, CA 92260

**Bruce F. Ruark**
c/o Alpha Financial
5902 Charles Schreiner Trail
Austin, TX  78749

**Bryan Shepley**
PO Box 93
Reidsville, NC 27323

**Kenneth D. Whitt**
PO Box 93
Reidsville, NC 27323

*/s/ Merle R. Arnold III*
Merle R. Arnold III
Georgia Bar No. 023503
merle.arnold@*troutmansanders.com*

TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
Telephone:  (404) 885-3000
Telecopy:     (404) 885-3995

1674158                                13

## Certification of Counsel

I hereby certify that this document is submitted in Times New Roman 14 point type as required by N.D. Ga. Local Rule 5.1(b).

*/s/ Merle R. Arnold III*
Merle R. Arnold III
Georgia Bar No. 023503
merle.arnold@*troutmansanders.com*
