S. GREGORY HAYS, receiver for
Mobile Billboards of America,
Inc., et al.,

      Plaintiff,

      v.

DAVID E. ADAM, et al.,

      Defendants.

CIVIL ACTION

NO. 1:05-CV-2705-CAP

**O R D E R**

This action comes before the court on several motions that are ripe for consideration. This order addresses the following motions:

1.    Motion to dismiss count II of the complaint [Doc. No. 248] by defendants Alternative Financial Concepts, LLC; Arthur Anderson; Arthur Anderson Retirement Planning, Inc.; Timothy L. Bradshaw; CLR Group, Inc.; Daniel S. Dark; Freedom Capital, LLC; James K. Gibson, Jr.; Keith Gibson; Victor Graham; Gibson & Associates, Inc.; Michael L. Lawson; Levonda Leamon; Legacy Estate Concepts, Inc.; Clarence J. Lyon, II; Rebecca Plummer; Elisabeth Rainey; James Rainey; Hugh Thacker; Craig Warner; and Gary P. Walker; all represented by Gary Bartko (the "Bartko defendants").

2.    Motion to compel discovery [Doc. No. 252] by defendants
      David Womack, Daryl Bornstein, Janalyn Bornstein, Craige
      DeMoss, and Jerry Poss, all represented by John Beam (the
      "Beam defendants").

3.    Motion to join the motion to dismiss count II of
      plaintiff's complaint, or, in the alternative, motion for
      summary judgment [Doc. No. 262] by the Beam defendants.

4.    Motion for partial summary judgment as to liability [Doc.
      No. 275] by the Receiver.

5.    Second motion to dismiss count II of the complaint [Doc.
      No. 301] by the Bartko defendants.

## Factual and Procedural Background

From 2001 through 2004, Mobile Billboards of America, Inc.
("MBA") used a network of sales agents to sell more than $60
million in mobile billboard investments to investors as part of
what was ultimately discovered to be massive Ponzi scheme.[1]  The

---

[1] The defendants have denied most of the statements in the
Receiver's Statement of Undisputed Material Facts, often with
little, if any, countervailing evidentiary support.  Many of their
responses to the Receiver's asserted facts read more like
hyper-technical discovery objections than the good-faith admissions
or denials contemplated by the local rules.  Nonetheless, due to
these nearly universal denials, the court here does not purport to
set forth only those facts the parties agree are "undisputed," but
simply lays out the general framework of the Receiver's allegations
to provide the reader some understanding of the background of the
case.  The court thus makes no "findings" in this order, and
nothing in this Background should be read as indicating the finding

scheme worked as follows: Purchasers paid MBA $10,000 to $20,000 apiece to purchase mobile billboard frames that were to be mounted on the sides of large trucks. Simultaneously with the purchase of the billboard, and even though their purchase agreements technically provided them with several options as to what to do with the billboards, all of the purchasers leased the billboards back to Outdoor Media Industries ("Outdoor Media") for a seven-year term. Outdoor Media was a shell company affiliated with MBA and owned and operated by MBA's principals. Investors were told that Outdoor Media would arrange for placement of the billboard on a truck for advertising and make monthly lease payments to the investor, resulting in a fixed return of approximately 13.49% per year.

As part of the purchase, MBA agreed to repurchase the billboard after the lease term for the full purchase price. Investors were promised that MBA had established a trust, the Reserve Guarantee Trust ("RGT") to assure that money would be available to fund the repurchase obligation, and that a portion of the purchase price paid by investors would be deposited into RGT for this purpose. In consideration for the portion of their

of any fact. The court addresses in its Legal Analysis those purported factual disputes that either one or both of the parties contend are genuine and material to the resolution of their motions for summary judgment.

purchase price made to RGT, investors were issued a "Trust Secured Certificate" that entitled them to "an undivided beneficial interest in the assets of RGT with a liquidation amount of up to [$20,000 times the number of billboards] purchased. RGT was also affiliated with MBA and was controlled by MBA's officers.

In actuality, Outdoor Media's mobile billboard business did not generate sufficient revenues to make the monthly lease payments to the investors. In fact, the billboards could not have generated profits because very few, if any, of the billboards actually existed. Instead, MBA transferred money paid by recent investors to Outdoor Media to fund the lease payments to earlier investors. Also, funds supposedly deposited into RGT were used for other purposes and would likely have been unavailable to investors for repurchase of the billboards.

The sales agents – the defendants in this case – received commissions and bonuses for their participation in the mobile billboard scheme. The agents were members of organizations assembled by "master sales agents," but operated under contracts with MBA. MBA typically paid a 27% commission per billboard sale to one of the master sales agents, who in turn made a commission payment to the individual within his or her organization that actually made the sale.

The Receiver claims that the billboard investments sold by the sales agents were unregistered securities. The agents sold the alleged unregistered securities and received upwards of $10 million in commissions and bonuses from the sales even though they were not registered securities dealers. The Ponzi scheme was dependent upon the sales agents' efforts in soliciting investors. The Receiver does not allege any malfeasance on the part of the agents.

In September 2004, the Securities and Exchange Commission ("SEC") filed an enforcement action, Civil No. 1:04-CV-2763-WBH, in this court against MBA and affiliated entities and individuals. Plaintiff S. Gregory Hays (the "Receiver") was appointed the receiver for MBA and its affiliated businesses. The Receiver filed this action on October 18, 2005 [Doc. No. 1], seeking an accounting and recovery of the commissions and bonuses paid to the defendant sales agents pursuant to the investment scheme. Although the original complaint contained allegations of fraudulent conveyance, the Receiver later dropped this count [Doc. No. 298] and stipulated that its lawsuit was limited to the allegation that the defendant sales agents sold unregistered securities and did not allege any other "bad acts" on behalf of the defendants [Doc. No. 280].

## Legal Analysis

I.  Bartko and Beam Defendants' Motions to Dismiss/Motion for Summary Judgment [Doc. Nos. 248, 262]

The Bartko defendants' motion to dismiss [Doc. No. 248] argues that the Receiver's unjust enrichment claim is precluded by Georgia law due to an existence of a contract between the parties. Although styled as a motion to dismiss, the motion relies almost exclusively on matters outside the pleadings. Accordingly, the court will construe the motion as a motion for summary judgment. See Fed. R. Civ. P. 12(b); Circuit Property Management & Investment v. Lewis, 752 F.2d 599, 605 (11th Cir. 1985) (conversion of a motion to dismiss under 12(b)(6) to a motion for summary judgment required once court considers matters outside the pleadings). The Beam defendants' motion to join the motion to dismiss, or, in the alternative, motion for summary judgment [Doc. No. 262] will be treated as a motion for summary judgment for the same reasons. Because the issues discussed in these motions have also fully been briefed in connection with the Receiver's motion for partial summary judgment as to liability [Doc. No. 275], the court will address the parties' cross-motions for summary judgment in the discussion of the Receiver's motion below.

II. <u>Beam Defendants' Motion to Compel Discovery [Doc. No. 252]</u>.

Before moving to compel discovery, the federal and local rules of procedure require the moving party to confer in good faith with the other party to resolve the issue and to certify to the court that he or she has done so. Fed. R. Civ. P. 37(a)(2)(A)(B); L.R. 37.1. It appears from the record that the Receiver's counsel made numerous attempts to communicate with Beam regarding discovery issues, only to receive no response. The only evidence that the Beam defendants attempted to resolve the issue is a single letter from Beam to the Receiver's counsel dated July 18, 2006. This single letter does not constitute a sufficient effort to resolve the issue outside of court pursuant to Rule 37(a) and Local Rule 37.1. <u>See</u> <u>Garner v. Academy Collection Service</u>, No. 3:04-CV-93-JTC, 2005 U.S. Dist. LEXIS 43265, at *4 (N.D. Ga. May 24, 2005) (denying motion to compel where party's single letter and failure to discuss discovery issues did not constitute good-faith effort to resolve dispute). The Beam defendants' motion to compel [Doc. No. 252] is therefore DENIED.[2]

---

[2] Regardless of its ruling here, the court notes that the discovery issues addressed by the Beam defendants' motion to compel appear to now be moot, as all summary judgment issues are fully briefed and ripe to be ruled upon.

III. The Plaintiff's Partial Motion for Summary Judgment on Liability [Doc. No. 275].

Despite the complex nature of this case in terms of the number of defendants, pending related cases, and extensive briefing by the parties, the Receiver's theory of liability is straightforward. The Receiver argues that because the mobile billboard investment sold by the defendants was an unregistered security, its sale violated federal securities laws. Thus, the Receiver reasons, regardless of the knowledge or intent of the defendants, the monies paid to them as commissions by MBA for selling the unregistered securities constituted unjust enrichment and should now be returned to the Receiver to be distributed to creditors and investors. The defendants, however, argue that the transactions at issue constituted "business opportunities," not securities, and were properly registered as such with the Federal Trade Commission (FTC).

The court's analysis on the parties cross-motions for summary judgment accordingly involves, at most, two steps. First, the court must determine whether the underlying investments constituted securities under federal securities laws. If so, then the court must determine if, as a matter of law, the Receiver is entitled to recovery based on their claim for unjust enrichment. If the

Receiver meets his burden at both stages, a grant of summary judgment to the Receiver is proper.

A. <u>Summary Judgment Standard</u>

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The movant carries the initial burden and must show the Court that there is "an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). Resolving all doubts in favor of the nonmoving party, the

court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

The court may not weigh conflicting evidence or weigh the credibility of the parties. See Hairston v. Gainesville Sun Publishing Company, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment. Id. When a district court is, as here, presented cross motions for summary judgment on the same issues, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2720, at 335-36 (1998) (footnote omitted).

B.  The Underlying Investments Were Securities

The basis of the Receiver's claims is that the transactions carried out by the defendants constituted sales of investment contracts under federal securities law. The Securities Acts of 1933 and 1934 define a "security" as including "investment contracts." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). The Supreme Court in SEC v. W.J. Howey Company set out the classic test for determining when a transaction is properly characterized as an investment contract that falls within the ambit of the federal

securities laws.  See SEC v. W.J. Howey Co., 328 U.S. 293, 298-99, 66 S. Ct. 1100, 1103 (1946).  The Eleventh Circuit has interpreted the Howey test to comprise the following three elements: (1) an investment of money; (2) a common enterprise; and (3) the expectation of profits derived solely from the efforts of others. SEC v. Unique Financial Concepts, Inc., 196 F.3d 1195, 1199 (11th Cir. 1999)(citing Villeneuve v. Advanced Business Concepts Corp., 698 F.2d 1121, 1124 (11th Cir. 1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984)).  An investment scheme promising a fixed rate of return can be an "investment contract" and thus a security subject to the federal securities laws.  SEC v. Edwards, 540 U.S. 389, 397, 124 S. Ct. 892, 898-99 (2004).  Because the defendants do not dispute that the first Howey element – an investment of money – has been satisfied in this case, the court will only address the applicability of the second and third elements below.

1.  Common Enterprise Prong

There is no uniformly accepted method of determining whether a transaction satisfies the common enterprise requirement of Howey. Instead, the circuit courts employ various interpretations, with most circuits using the "horizontal commonality" approach.  Under that interpretation, courts find the common enterprise requirement satisfied where a movant shows "horizontal commonality," that is the "pooling" of investors' funds as a result of which the

individual investors share all the risks and benefits of the business enterprise.  <u>SEC v. ETS Payphones, Inc.</u>, 300 F.3d 1281, 1284 (11th Cir. 2002) (cataloging cases).

The Eleventh Circuit, however, uses a method known as the "broad vertical commonality" approach.  Broad vertical commonality, the easiest to satisfy of the various approaches, only requires a movant to show that the investors are dependent upon the expertise or efforts of the investment promoter for their returns.  <u>Id.</u> at 1284.  The defendants contend that the Eleventh Circuit's usage of this method is inappropriate, as the Supreme Court appears to have used an analysis similar to the horizontal commonality approach to decide <u>Howey</u> itself.  Specifically, the defendants argue that the focus on the efforts of a promoter in the broad vertical commonality approach deprives the phrase "common enterprise" of any significance.  <u>See</u> <u>ETS Payphones</u>, 300 F.3d at 1285 (Lay, J.,[3] concurring) ("proof of horizontal commonality is required because requiring only proof of broad vertical commonality makes <u>Howey</u>'s third prong – expectation of profits to be derived from the efforts of others – superfluous").

Despite the defendants' arguments as to the superiority of one approach over another, however, the Eleventh Circuit has

_____

[3]   Judge Lay, a Circuit Judge from the Eighth Circuit, was sitting by designation.  <u>ETS Payphones</u>, 300 F.3d at 1281.

12

specifically considered the various approaches, including the horizontal commonality approach suggested by the defendants, and concluded that it is bound by precedent to employ the broad vertical commonality test. SEC v. ETS Payphones, Inc., 408 F.3d 727, 732 (11th Cir. 2005); see also Unique, 196 F.3d at 1199-1200 (applying broad vertical commonality test); Eberhardt v. Waters, 901 F.2d 1578, 1580-81 (11th Cir. 1990) (same); SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-79 (5th Cir. 1974)(same)[4]. Accordingly, this court is bound by the same precedent to utilize the broad vertical commonality test.

The mobile billboard sales at issue here clearly satisfy the broad vertical commonality test. To show a common enterprise under this test, it must be established that "the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." Villeneuve, 698 F.2d at 1124.

The defendants argue that the billboard purchasers were provided training and information by MBA that enabled them to rely on their own expertise, rather than those of a third party, when leasing the billboards. They further assert that the purchasers

_____

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

were free to lease the billboards to whomever they wanted, not just Outdoor Media. However, despite whatever options were theoretically presented to purchasers in the Offering Circular or other materials provided to them, the defendants have not shown any evidence to dispute the realities of the Ponzi scheme's actual operation. Specifically, 100% of the purchasers in the Ponzi scheme actually leased their billboards back to Outdoor Media, a shell company controlled by MBA, and were dependent on Outdoor Media to manage the billboards and generate their lease payments. Further, the very nature of the Ponzi scheme meant that it was dependent on MBA attracting newer investors to cover the payments from Outdoor Media to earlier investors. Thus, the defendants cannot dispute that "the fortunes of the [billboard purchasers were] interwoven with and dependent upon the efforts and success" of Outdoor Media and MBA. <u>Villeneuve</u>, 698 F.2d at 1124; <u>see also</u> <u>SEC v. ETS</u>, 408 F.3d at 732 (finding common enterprise where 99% of investors leased back phones to company operated by promoter and were reliant on promoter to attract new investors to pay earlier ones). As a result, the court concludes that the <u>Howey</u> common enterprise element has been satisfied.

2. <u>Expectation of Profits Prong</u>

The final <u>Howey</u> prong requires a showing that investors expect "profits to come solely from the efforts of others." <u>Howey</u>, 328 U.S. at 298-299, 66 S. Ct. at 1103. "[T]he touchstone" of an investment contract is "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." <u>United Housing Foundation, Inc. v. Forman</u>, 421 U.S. 837, 852, 95 S. Ct. 2051, 2060 (1975). The Eleventh Circuit's test seeks to determine "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." <u>Unique</u>, 196 F.3d at 1201 (citing <u>Koscot</u>, 497 F.2d at 483). An important component of this analysis is the "amount of control that the investors retain[ed] under their written agreements." <u>Albanese v. Fla. National Bank of Orlando</u>, 823 F.2d 408, 410 (11th Cir. 1987). However, the Supreme Court has consistently repeated the interpretive principle that courts should determine the contours of the term "security" from the posture that substance should be elevated over form, with a special sensitivity to the economic reality of the transaction, not its formal characteristics. <u>SEC v. Mutual Benefits Corporation</u>, 323 F. Supp.

2d 1337, 1340 (S.D. Fla. 2004)(citing <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336, 88 S. Ct. 548, 553 (1967)).

The defendants' argument on this element of the <u>Howey</u> test is based on what they claim was the significant amount of control provided to the billboard purchasers under the applicable written agreements. It is undisputed that the various agreements and other materials prepared by MBA, with benefit of counsel[5], purport to grant the purchasers various means of control over the billboards. Specifically, the purchase contract between MBA and the purchasers stated that the purchaser received rights to (a) receive delivery of the equipment; (b) receive a bill of sale containing specific identification numbers for the equipment; (c) receive training on marketing the equipment; (d) retain Outdoor Media or a third-party firm to service the billboards; (e) generate his or her own additional advertising revenue from outside advertising sources; and (f) optionally sell the equipment back to MBA after seven years. The defendants also note that all sales agents were required to instruct potential purchasers about the multiple options available to them regarding management of the billboards.

---

[5] The law firm that assisted MBA in preparing the agreements is the defendant in a related malpractice action pending before this court, <u>Hays v. Paul, Hastings, Janofsky & Walker LLP</u>, No. 1:06-CV-754-CAP.

Despite the multitude of "options" purportedly afforded to purchasers under the applicable agreements, however, the economic reality is that the purchasers exercised little or no control over the billboards. First, the defendants cannot dispute that 100% of the purchasers leased the billboards back to Outdoor Media, and thus received 100% of their profits from the efforts of MBA and Outdoor Media. Moreover, the defendants cannot dispute that few, if any, billboards actually existed. The defendants can hardly argue that the purchasers actually maintained control over the billboards when no such billboards *existed*. Unique, 196 F.3d at 1201 ("[t]hus, the investors retained no control over their investments, since there were no investments to control").

The Supreme Court's decision in SEC v. Edwards, 540 U.S. 389, 124 S. Ct. 892 (2004), controls the court's decision in this case. Edwards was the appeal of the Eleventh Circuit's decision in SEC v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002)("ETS I"). In that case, ETS operated a scheme in which it, in conjunction with a subsidiary company also controlled by ETS management, sold payphones to investors. Edwards, 540 U.S. at 391-92, 124 S. Ct. at 895. The investors then leased the phones back to ETS for a five-year period with the agreement that ETS would buy back the phones after that time. Id. ETS selected the site for the phone, installed the equipment, arranged for connection and long-distance

17

service, collected coin revenues, and maintained and repaired the phones. Id.

The Eleventh Circuit originally held that the scheme was not an investment contract, on the grounds that (1) an investment contract must offer either capital appreciation or a participation in the earnings of the enterprise; (2) such a definition excluded schemes offering a fixed rate of return; and (3) the requirement that the return on the investment be derived solely from the efforts of others was not satisfied when the purchasers had a contractual entitlement to the return. ETS I, 300 F.3d at 1284-85. The Supreme Court reversed the Eleventh Circuit, however, holding that a scheme offering a fixed rate of return could constitute and investment contract, and remanded the case for proceedings consistent with its holding. Edwards, 540 U.S. at 397, 124 S. Ct. at 899.

The Eleventh Circuit considered the case on remand in SEC v. ETS Payphones, Inc., 408 F.3d 727, 732 (11th Cir. 2005)("ETS II"). The court held that because 99% of investors leased the phones back to ETS, those investors relied on ETS (and the promoter) for profits, thus satisfying the common enterprise test. Id. at 732. As to the expectation of profits prong, the court found that the promoter, through ETS and it subsidiaries, provided the "essential managerial efforts" of phone placement, collection and maintenance.

Id. (citing Koscot, 497 F.2d at 483).  The court thus concluded

that the SEC had shown a likelihood of success on the merits on the

issue of whether the payphones constituted a security (the SEC had

asked for a preliminary injunction).  ETS II, 408 F.3d at 732-33.

The holding in ETS II is applicable to this case as well.[6]

After stripping away the illusory indicia of control provided to

purchasers by documents associated with the billboard sales, the

underlying Ponzi scheme in this case is essentially identical to

the one in ETS – it simply involves mobile billboards instead of

payphones.  The billboard purchasers, all of whom leased the

billboards back to Outdoor Media/MBA, were substantively passive

and depended on the "entrepreneurial or managerial efforts of

others."  Forman, 421 U.S. at 852, 95 S. Ct. at 2060.  The court

thus finds that the transactions at issue in this case constituted

the sales of investment contracts subject to federal securities

laws.

---

[6]    The Bartko defendants argue that the sales of the
billboards occurred before the Supreme Court's decision in Edwards,
when ETS I was the controlling law, and that Edwards/ETS II, should
not be applied retroactively.  While creative, this argument lacks
merit.  See Harper v. Virginia Department of Taxation, 509 U.S. 86,
97, 113 S. Ct. 2510, 2517 (U.S. 1993) ("[w]hen [the Supreme] Court
applies a rule of federal law to the parties before it, that rule
is the controlling interpretation of federal law and must be given
full retroactive effect in all cases still open on direct review
and as to all events, regardless of whether such events predate or
postdate our announcement of the rule").

Before proceeding to the next portion of its analysis, the court wishes to address two assertions in the Bartko defendants' briefs that it finds troubling. The Bartko defendants assert in their response brief that "several state regulators, including those in California, North Carolina, South Carolina and Georgia tacitly treated the MBA Purchase Contracts as a business opportunity by their acceptance and approval of regulatory filings made by MBA in those states." [Doc. No. 288 at 15]. The Bartko defendants also assert "that there has not yet been a comprehensive evaluation made or a judicial declaration reached, including that the MBA Purchase Contracts qualify as investment contracts." Id. at 17. However, the court is aware of at least one other court's determination that a Bartko defendant's sales of the MBA billboards constituted the sale of unregistered securities. See Ivester v. Alternative Financial Concepts, LLC, No. 05-CVS-228, at 6-7 (N.C. Super. Ct. Dec. 28, 2005). Furthermore, a simple Lexis or Westlaw search reveals that cease and desist orders have been issued against defendants in this case by securities regulators in

Alabama[7], Illinois[8], Indiana[9], Missouri[10], North Carolina[11], and Pennsylvania[12]. All of these orders are based on the state

---

[7] Cease and Desist Orders, Alabama Securities Commission, Nos. CD-2005-29A (Jan. 4, 2006) (respondents: MBA, Tommy White, Jackie Adams, Tim Bradshaw, J. Wendell Brigance, James Lush, and Sandra Lush); and CD-2005-29 (Sep. 6, 2005) (Tommy White).

[8] Order of Prohibition, Illinois Securities Department, No. 0400716 (Feb. 14, 2006) (respondents: MBA, its officers, directors, employees, affiliates, successors, agents, and assigns).

[9] Cease and Desist Order, Indiana Secretary of State, Securities Division, No. 06-0114 CD (Dec. 13, 2006) (MBA, Outdoor Media, Reserve Guarantee Trust, Michael Lomas, Michael Young, and Daniel Bookout).

[10] Order to Cease and Desist, Missouri Securities Commission, No. AP-04-76 (Sep. 28, 2004) (MBA, Outdoor Media, Michael Young, Michael Lomas, Laurinda Holohan, and Barbara Plattenburg).

[11] Cease and Desist Orders, North Carolina Securities Division, Nos. 04-025-IG (Aug. 19, 2005) (James Rainey); 04-023-IG (Aug. 19, 2005) (Daniel Dark); 03-017-IG (Apr. 2, 2004) (MBA, Matthew Bondurant, Stephen Gilley, Timothy Bradshaw, Alternative Financial Concepts); 03-017-CC (Aug. 29, 2005) (MBA, any and all persons in concert with MBA); 04-022-IG (Sep. 7, 2005) (Arthur Anderson); 04-030-IG (Aug. 19, 2005) (Gary Walker); 04-031-IG (Oct. 28, 2005) (Ronnie Ward); 04-032-IG (Oct. 28, 2005) (Shelva Ward); 04-029-IG (Sep. 22, 2005)(Hugh Thacker); 04-026-IG (Sep. 7, 2005) (Bryan Shepley); 04-035-IG (Sep. 7, 2005) (Victor Graham); 04-039-IG (Nov. 18, 2005) (Paul Hopkins); 04-040-IG (Sep. 16, 2005) (Willaim Isphording); 04-042-IG (Sep. 7, 2005) (Clarence Lyon); 04-033-IG (Sep. 7, 2005) (Kenneth Whitt); 04-028-IG (Oct. 11, 2005) (Joel Teague); 04-043-IG (Sep. 8, 2005) (Stan Warm); 04-037-IG (Sep. 7, 2005) (Stephen Bradshaw); 04-027-IG (Sep. 7, 2005) (Benjamin Sumner); 04-036-IG (Sep. 16, 2005) (Danny Baxley); 04-034-IG (Sep. 15, 2004)(Dennis Raynor); 04-044-IG (Sep. 15, 2004) (Barrie Lange); and 04-038-IG (Sep. 15, 2004) (Mary Dean).

[12] Summary Order to Cease and Desist, Pennsylvania Securities Commission, No. 2004-03-26 (Apr. 7, 2004) (Michael Young, Laurinda Holohan); Order, No. 2004-03-23 (Aug. 8, 2006) (James P. DiLuigi).

regulators' determination that the billboard sales/lease-back investments were unregulated securities. These decisions and orders were available to the defendants well before the conclusion of summary judgment briefing. Thus, for the Bartko defendants to continue to assert that no court or agency has reached a determination as to whether the billboards are investment contracts in light of the considerable amount of evidence to the contrary is disingenuous, at best.

C. The Receiver's Equitable Claims for Relief

The Receiver claims that the defendants have been unjustly enriched through the sale of unregistered securities and seeks to recover the commissions and bonuses paid to each defendant. The assertion of unjust enrichment claims is common in securities fraud cases, see, e.g., SEC v. Chemical Trust, 2000 U.S. Dist. LEXIS 19786, at *32-33 (S.D. Fla. 2000) (ordering defendant to disgorge funds received from a Ponzi scheme involving sale of unregistered securities because such funds constituted unjust enrichment). Nonetheless, the Receiver's approach in this case of claiming unjust enrichment against sales agents working for MBA – the entity in whose shoes the receiver now stands – is somewhat novel. The court will now address the propriety of such a claim.

## 1.  The Sale of the Billboards was Unlawful

Sections 5(a) and 5(c) of the Securities Act prohibit any person from selling, or offering to sell, a security in interstate commerce unless a registration statement has been filed with the SEC.  See 15 U.S.C. §§ 77e(a), 77e(c) (prohibiting use of instrumentalities of interstate commerce to sell or attempt to sell unregistered securities).  The Act imposes strict liability for sales of unregistered securities regardless of any degree of fault, negligent or intentional, on the seller's part.  SEC v. Calvo, 378 F.3d 1211, 1219 (11th Cir. 2004).  Here, the court has determined that the mobile billboards constituted investment contracts covered by Sections 5(a) and 5(c).  The defendants offered and sold the securities to the public although no registration statement was filed or in effect with respect to any of the securities. Accordingly, the defendants' sales or offers to sell the mobile billboard investments to investors violated the law, and any commissions or bonuses they received from such sales were thus received unjustly.  See SEC v. Collins, No. 01-C-3085, 2003 U.S. Dist. LEXIS 8838, at *14-15 (N.D. Ill. May 27, 2003) (persons who receive money by means of a violation of the securities laws do so unjustly).  The issue, then, is whether the Receiver, rather than the SEC or investors in the scheme, may properly bring a claim for unjust enrichment against the sales agent defendants.

23

## 2.   The Receiver's Standing to Bring the Claim

As an initial matter, the court must first determine whether the receiver has standing to seek recovery of commissions and bonuses paid to the defendants by MBA.

An equity receiver may sue only to redress injuries to the entity in receivership. See e.g., Scholes v. Lehmann, 56 F.3d 750, 753 (7th Cir. 1995) (holding an equity receiver may sue only to redress injuries to the entity in receivership); Scholes v. Stone, McGuire & Benjamin, 821 F.Supp. 533, 535 (N.D. Ill. 1993) ("it is a well-known legal principle that a receiver can bring only those claims belonging to the entity it represents and cannot bring claims on behalf of third parties, . . . receivers in general have standing to assert state-law claims on behalf of entities in receivership but such claims must involve damages which belong to the entities rather than to the investors"). Although it is clear that the receiver cannot bring claims directly on behalf of third-parties, such as investors, those parties may nonetheless indirectly benefit from the receiver's action as creditors of the receivership. See Scholes v. Lehmann, 56 F.3d at 753 (finding that a corporation in receivership was harmed by transfers used for an unauthorized purpose and the receiver had standing to bring claims to seek return of those funds to distribute them to the tort creditors of the receivership); SEC v. Cook, No. 3:00-CV-272-R,

2001 U.S. Dist. LEXIS 2601, at *6 (N.D. Tex. March 8, 2001) (a receiver represents not only the entity in receivership, but also the interests of its creditors).

The injured investors in this case are, or are potentially, tort creditors of the receivership. See Scholes v. Lehmann, 56 F.3d at 755. The Receiver, on behalf of MBA and the other receivership entities, is entitled to seek return of these funds for the benefit of the receivership, so that it may reimburse its creditors and/or victims of its tortious actions. See id. at 754. Additionally, the Receiver's claims against the defendants, if successful, will benefit the receivership estate as a whole rather than any individual creditor. Warfield v. Alaniz, 453 F. Supp. 2d 1118, 1127 (D. Ariz. 2006). Accordingly, the court finds that the Receiver has standing to bring the alleged state-law claims.

    3.    The Effect of the Contracts Between MBA and the
          Defendants Under Georgia Law

The defendants argue that under Georgia law, a plaintiff cannot sustain a cause of action for unjust enrichment when a valid contract exists between the plaintiff and the defendant. They are correct. See, e.g., Stoker v. Bellemeade, LLC, 272 Ga. App. 817, 615 S.E.2d 1, 5 (2005) (plaintiffs may recover under the theory of unjust enrichment "when there is no legal contract and when there has been a benefit conferred which would result in an unjust

enrichment unless compensated") (emphasis added).  However, this general rule has exceptions, and the Receiver's claim falls within one of those exceptions.

In this case, many of the defendants have produced the contracts between them and MBA providing for commissions and bonuses in connection with the sale of the billboard investments. The Receiver does not dispute that the remaining defendants signed similar contracts.  The defendants accordingly assert that the Receiver cannot maintain an unjust enrichment claim against them because of the existence of the contracts.  <u>See</u> <u>id.</u>  However, in Georgia, a contract to do an immoral or illegal thing is void. O.C.G.A. § 13-8-1.  In order for the purpose or object of a contract to be illegal, thereby making the contract void, the contract must require a violation of law when performed. <u>Shannandoah, Inc. v. Smith</u>, 140 Ga. App. 200, 202, 230 S.E.2d 351, 352 (1976).

Here, the contracts between MBA and the sales agents clearly contemplate the marketing and sale of the MBA billboard investments, which the court has determined constituted unregistered securities.  Federal law provides that "[e]very contract . . ., the performance of which involves the violation of, or the continuance of any relationship or practice in violation of [federal securities laws] shall be <u>void</u>."  15 U.S.C. § 78cc

26

(emphasis added). Because the act of performance under the contracts necessarily resulted in violation of federal securities laws by the defendants, the court holds that the contracts were void and thus do not bar the Receiver's claim for unjust enrichment. <u>Shannandoah</u>, 140 Ga. App. at 202; <u>see also</u> <u>Regional Properties, Inc. v. Financial and Real Estate Consulting Company</u>, 678 F.2d 552, 560 (5th Cir. 1982) (holding that 15 U.S.C. § 78cc renders void contracts that are illegal as in fact performed. "That these contracts, under different circumstances, could have been performed without violating the Act is immaterial.").

   4.   <u>Whether the Facts Warrant Recovery Under the Receiver's Unjust Enrichment Claim</u>

The court must now determine whether the undisputed facts of the case support a finding that the defendants must disgorge their commissions and bonuses to the Receiver under an unjust enrichment theory. A district court has broad equity powers to order the disgorgement of "ill-gotten gains" obtained through the violation of the securities laws. <u>See</u> <u>SEC v. First Pacific Bancorp</u>, 142 F.3d 1186, 1191-92 (9th Cir. 1998); <u>SEC v. Fischbach Corp.</u>, 133 F.3d 170, 175 (2d Cir. 1997). Further, where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained

proceeds.  First Pacific, 142 F.3d at 175; see also SEC v. Hughes

Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997).  "Disgorgement is

designed to deprive a wrongdoer of unjust enrichment, and to deter

others from violating securities laws by making violations

unprofitable." First Pacific, 142 F.3d at 1191.

While cases in which the SEC or injured investors seek

recovery of profits derived from the sale of unregistered

securities are common, there is very little precedent on whether a

receiver can bring such a claim against the sales agents who sold

the securities.  The general rule is that a court can obtain

equitable relief from a party against whom no wrongdoing is alleged

if it is established that the party possesses illegally obtained

profits but has no legitimate claim to them.  SEC v. Cherif, 933

F.2d 403, 414 (7th Cir. 1991).  "The courts impose [equitable

remedies] where, rightfully or wrongfully, a party has obtained

property which unjustly enriches him." U.S. v. Cannistraro, 694 F.

Supp. 62, 72 n.11 (D.N.J. 1988), modified, 871 F.2d 1210 (3rd Cir.

1989).

Although not directly on point, the Eleventh Circuit has held,

"It is settled that an equity receiver has the power to bring

ancillary actions to recover assets which were fraudulently

transferred to investors in a Ponzi scheme." Commodity Futures

Trading Commission v. American Commodity Group Corporation, 753

F.2d 862, 866 n.6 (11th Cir. 1984).  It follows that if a receiver can recover Ponzi scheme profits from investors who have done nothing wrong, he would also be entitled to recover Ponzi scheme profits held by sales agents like the defendants, who illegally sold unregistered securities, and without whose efforts the scheme could not have occurred.

The Receiver has cited the most factually analogous case the court is aware of in which a court has addressed the situation at hand – a receiver seeking to recover payments made to sales agents under an unjust enrichment theory.  See In re Alpha Telecom, Inc., No. CV 01-1283-PA, 2004 U.S. Dist. LEXIS 20002, at *19-20 (D. Or. Aug. 18, 2004).  That case dealt with the fallout of a Ponzi scheme involving the sale and lease-back of pay phones similar to the scheme in the case at hand.  SEC v. Alpha Telcom, Inc., 187 F. Supp. 2d 1250, 1255-58 (D. Or. 2002)(discussing facts of underlying scheme in SEC enforcement action).  In In re Alpha Telecom, the receiver sought disgorgement of profits from the sales agents of Alpha Telecom even though he alleged no wrongdoing on the part of the sales agents.  Id. at *18-19.  The sales agent defendants countered that they had earned their commissions pursuant to their contract with Alpha Telecom, and that they only received their commissions after Alpha Telecom received purchase money from investors.  Id. at *20.  Further, the sales agents noted that other

employees of Alpha Telecom had not been asked to return their salaries and sellers of equipment to the company had not been required to return the payments they received. _Id._

The court reasoned that there was one critical difference between the sales agents and everyone else who had provided services to Alpha Telecom that somehow furthered the scheme: the services provided by the agents were, in hindsight, illegal. _Id._ at *21-22. The sale of the unregistered securities was a strict liability offense, regardless of whether the sales agents knew it was wrong, whereas the services provided by suppliers and other employees were not, even if those services indirectly helped further the fraud. _Id._ at *22. The court held that law could not permit the sales agents to benefit from the sales of unregistered securities and ordered the agents to disgorge the amounts by which they were unjustly enriched. _In re Alpha Telecom_, at *22. The court concluded its discussion of the issue as follows:

> Admittedly, this tends to make the agents guarantors of the products they sell. However, it also will make sales agents cautious, and they are in an ideal position to curb abuses. If an agent has doubts about the integrity of the product, or whether it is an unregistered security, the agent should not sell the product. Faced with the risk of disgorgement, due diligence might really be diligent, instead of an exercise in papering the file. This approach is not unprecedented in the law. For instance, modern product liability laws make retailers strictly liable, not just the manufacturer of the product.

Id.  The holding in <u>Alpha Telecom</u>, is, of course, not binding on
this court.  However, the court finds it persuasive.

Here, as in <u>Alpha Telecom</u>, the defendant sales agents were
critical to the operation of the Ponzi scheme.  In fact, the scheme
could not have succeeded without their efforts.  There is no
allegation of any sort of malfeasance on the defendants' parts;
indeed, it appears that many or most of them performed their
contracts without any idea that they were doing anything wrong.
That is not relevant, though.  The simple, undisputed fact is that
the defendants sold what has been determined to be unregistered
securities, which is a strict liability offense.  <u>See</u> <u>Calvo</u>, 378 at
1219 (11th Cir. 2004) ("the Securities Act of 1933 imposes strict
liability on offerors and sellers of unregistered securities . . .
regardless of . . . any degree of fault, negligent or intentional,
on the seller's part").  Just as the law would require innocent
investors to disgorge profits obtained from investing in an
unlawful Ponzi scheme, <u>see</u> <u>American Commodity Group</u>, 753 F.2d at
866 n.6, it dictates that the court cannot permit the sales agent
defendants to unjustly benefit from their unlawful sales of
securities in furtherance of a Ponzi scheme.  The court will
accordingly use its powers in equity to require the defendants to
disgorge their commissions and bonuses arising from these
activities.

## 5. There is No Dispute of Material Fact as to Whether the Defendants Received Commissions

Defendants Adam, Brigance, Dempsey, DiLuigi, Isphording, J. Lush, S. Lush, Nemo Trust, L. Salter, S. Salter, Sampson, Silvers, Sumner, and Teague, all represented by William Leonard (the "Leonard Defendants") argue that the Receiver has not presented evidence that the defendants were, in fact, paid commissions for the sales. To support their argument, the Leonard defendants cite unverified interrogatory responses by three defendants who claim they never received commissions. This argument is unfounded. The Receiver has presented evidence of his extensive investigation of the funds involved in the Ponzi scheme. The Receiver determined through his investigation that each defendant received money for selling MBA investments. The only evidence presented by any of the defendants to dispute the Receiver's finding is the unverified interrogatory responses cited by the Leonard defendants. However, those unverified responses cannot be considered by the court. See Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) ("[u]nsworn statements 'do not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion.")(quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n.17, 90 S. Ct. 1598, 1608-09 (1970)). Accordingly, there is no genuine issue of material fact

before the court as to whether the defendants received commissions for the sale of the MBA billboards. Any disputes between the parties as to the actual amounts received are more properly addressed in later proceedings on damages.

6. The Doctrine of In Pari Delicto Does Not Deprive the Receiver of Standing

The Leonard defendants also argue that the Receiver has no standing to assert claims against the defendants because the Receiver stands in the shoes of the fraudfeasor corporation, not those of investors. This is simply a rehash of the *in pari delicto* argument made by the Bartko defendants in their motion to dismiss [Doc. No. 267]. The court previously rejected that argument in its order denying the motion to dismiss [Doc. No. 319], and rejects it here, as well. See Scholes, 56 F.3d at 754 ("the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated").

7. The Defendants Did Not Have to Commit Fraud In Order to be Subject to Disgorgement

The defendants also make the same argument that was rejected in In re Alpha Telecom: that the defendants are not subject to disgorgement because they did not knowingly do anything wrong and were simply a few individuals amongst many contributing to the operation of MBA. The defendants cite two cases supposedly standing for the proposition that a district court may not order

disgorgement when there is no evidence of fraud or wrongdoing by the defendant. See CFTC v. Sidoti, 178 F.3d 1132, 1138 (11th Cir. 1999); FTC v. Gem Merchandising Corp., 87 F.3d 466 (11th Cir. 1996). The defendants interpretation is a misreading of the cases.

In Sidoti, the defendants had been found liable at trial for fraud and were ordered to disgorge their profits from the years 1990 to 1997. Id. at 1137-38. The Eleventh Circuit held that the district court abused its discretion by ordering disgorgement of profits from the period of 1995-97, however, because no evidence of fraud had been shown for this time period. Id. at 1138. Nowhere did the Eleventh Circuit hold that a court could not order disgorgement unless there was evidence of fraud. Moreover, in the case at hand, the defendants have been ordered to disgorge profits from their illegal sales of unregistered securities, an offense for which their state of mind was irrelevant.

In Gem Merchandising, the defendant company and its president were found to have engaged in unfair practices in telemarketing medical alert devices and accordingly ordered to reimburse consumers. Id. at 467. The president of Gem Merchandising argued that disgorgement was not an appropriate remedy because he was not found individually liable. Id. at 470. The Eleventh Circuit disagreed, noting, "the FTC must show that the individual defendants participated directly in the practices or acts or had

34

authority to control them . . . The FTC must then demonstrate that the individual had some knowledge of the practices." The court held that because the president had direct control over the activities of Gem Merchandising and was aware of the illegal practices, the court properly held him individually liable. <u>Id.</u> at 470. Nothing in <u>Gem Merchandising</u> prohibits requiring the defendants in the current case to disgorge their profits. In fact, the opposite is true: because the defendants "participated directly" in the practice of selling unregistered securities, <u>Gem Merchandising</u> makes it clear that they should be required to disgorge the profits obtained through such acts. <u>Id.</u> The cases cited by the defendants do not support their argument on this issue, which the court accordingly rejects.

The court thus GRANTS the Receiver's partial motion for summary judgment as to liability [Doc. No. 275]. The Bartko defendants' motion to dismiss count II of the complaint [Doc. No. 248] and the Beam defendants' motion to join the motion to dismiss count II of plaintiff's complaint, or, in the alternative, motion for summary judgment [Doc. No. 262] are accordingly DENIED.

IV. The Bartko Defendants' Second Motion to Dismiss Count II [Doc. No. 301]

A. Standard for Motions to Dismiss

A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 103 (1957); Bradberry v. Pinellas County, 789 F.2d 1513, 1515 (11th Cir. 1986). The rules of pleading require only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 8(a). Moreover, the court must, "at this stage of the litigation, . . . accept [the plaintiff's] allegations as true." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984); Stephens v. HHS, 901 F.2d 1571, 1573 (11th Cir. 1990); cf. South Florida Water Management District v. Montalvo, 84 F.3d 402, 409 n.10 (11th Cir. 1996)(conclusory allegations and unwarranted deductions of fact are not deemed true on a motion to dismiss).

B. Application of Law

The Bartko defendants argue that Count II (Unjust Enrichment/Constructive Trust) of the complaint must be dismissed because it was brought 13 months after the SEC instituted its civil enforcement action against MBA, thus fell outside the one year

statute of limitations prescribed by § 13 of the Securities Act, 15 U.S.C. § 77m. As a threshold matter, the court notes that a statute of limitations is an affirmative defense, and the Bartko defendants waived the defense by not asserting it in their initial responsive pleading. See JSK v. Hendry County School Bd., 941 F.2d 1563, 1570 (11th Cir. 1991)("[a] statute of limitations time bar is not jurisdictional; rather, it constitutes an affirmative defense that is waived if the defendant fails to raise it in his answer") (citing Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150, 1167 (3d Cir. 1986)). Here, not only did the Bartko defendants fail to raise this defense in their answer [Doc. No. 75]; they also failed to raise it in their first [Doc. No. 248] and second [Doc. No. 267] motions to dismiss.[13]

Even had the statute of limitations argument been timely, however, that argument lacks merit for the simple reason that the Receiver is not pursuing a claim under the federal securities laws. The Receiver's claim is a state-law claim for unjust enrichment, which the defendants concede is subject to a four year statute of limitations in Georgia. Koncul Enterprises v. Fleet Finance, Inc., 279 Ga. App. 39, 42, 630 S.E.2d 567, 570 (2006) (citing O.C.G.A.

---

[13] Although the Bartko defendants' motion to dismiss is captioned "Second Motion to Dismiss Count II of Plaintiff's Complaint," is actually the third motion to dismiss they have filed in this case.

§ 9-3-26).  The Georgia statute of limitations applies to the Receiver's state law claim, and the Bartko defendants have not argued that another state-law limitations period should apply.  <u>See Wuliger v. Owens</u>, 365 F. Supp. 2d 838, 850-53 (N.D. Ohio 2005) (applying two-year state limitations period to state-law claims brought by receiver against sales agent based on the agent's sales of unregistered securities; the one year federal statute of limitations applied only to claims actually brought by the receiver under the federal act).  Accordingly, the motion to dismiss [Doc. No. 301] is DENIED.[14]

## Conclusion

Having found that the billboard investments constituted unregistered securities under federal law, and that the defendants are subject to the equitable remedy of disgorgement of their commissions and bonuses, the court rules as follows:

1.   The Receiver's partial motion for summary judgment as to liability [Doc. No. 275] is hereby GRANTED.  The court will schedule a status hearing to determine the date and format of future proceedings to determine damages.

---

[14]   The Bartko defendants also appear to argue in the motion that the Receiver's state law claims should be dismissed because they rely on strict liability and are thus disguised Securities Act claims.   The Bartko defendants cite no support for this proposition, which the court rejects.

2.    The Beam defendants' motion to compel discovery [Doc. No. 252] is DENIED.

3.    The Bartko defendants' motion to dismiss count II of the complaint [Doc. No. 248] is DENIED.

4.    The Beam defendants' motion to join the motion to dismiss count II of the plaintiff's complaint, or, in the alternative, motion for summary judgment [Doc. No. 262] is DENIED.

5.    The Bartko defendants' second motion to dismiss Count II [Doc. No. 301] is DENIED.

6.    The Receiver's motion for leave to file excess pages [Doc. No. 302] is GRANTED.

7.    The clerk is INSTRUCTED to terminate the pending status of the Receiver's motion to strike AF, Inc.'s answer to complaint, motion for clerk's entry of default against AF, Inc., and motion for default judgment against AF, Inc. [Doc. No. 176].  This motion was withdrawn pursuant to the court's March 6, 2007, order [Doc. No. 320].

SO ORDERED, this 15th day of March, 2007.


                              /s/Charles A. Pannell, Jr.
                              CHARLES A. PANNELL JR.
                              United States District Judge